# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **JEWEL WALKER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:14-CV-1498-L (BH)** |
| | § | |
| **CAROLYN COLVIN, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of transfer dated June 30, 2014 (doc. 16),  this case has been transferred for the conduct of all further proceedings and the entry of judgment.  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED in part** and **REVERSED in part,** and the case is **REMANDED** for reconsideration.

## I.   BACKGROUND

### A.   Procedural History

Jewel Sheridan Walker (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for supplemental security income (SSI) under Title XVI of the Social Security Act.[2]  On July 11, 2011, Plaintiff applied for SSI, alleging disability beginning on April 15, 2008, due to low back pain and post-traumatic stress disorder (PTSD).  (R. at 17, 87-88.)  Her application was denied initially and upon reconsideration.  (R. at 89, 100.)  Plaintiff requested a hearing

---

[2]  The background information is summarized from the record of the administrative proceedings, which is designated as "R."

before an Administrative Law Judge (ALJ), and she personally appeared and testified at a hearing held on December 6, 2012. (R. at 17, 33-63, 105.) At the hearing, she consented to an amendment of her onset date to July 11, 2011, her application date. (R. at 37.) On December 21, 2012, the ALJ issued his decision finding Plaintiff not disabled. (R. at 17-29.) She requested review of the ALJ's decision, and the Appeals Council denied her request on February 26, 2014, making the ALJ's decision the final decision of the Commissioner. (R. at 1-3, 13.) Plaintiff timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (*See* doc. 1.)

**B.    Factual History**

**1.    Age, Education, and Work Experience**

Plaintiff was born on March 5, 1965, and was 47 years old at the time of the hearing before the ALJ. (R. at 36, 87-88, 113.) She had an eleventh grade education and no past relevant work. (R. at 58, 60.)

**2.    Medical, Psychological, and Psychiatric Evidence**

On April 10, 2003, Plaintiff presented to Cummins Health Center, Inc. for a psychiatric evaluation due to stress, and it was recommended that she undergo individual and family therapy in order to alleviate stress caused by issues with her family. (R. at 383-384.) From May 8, 2003 until July 21, 2005, she underwent therapy. (R. at 386-424.) Her discharge summary reported that her Global Assessment of Functioning (GAF) at admission was 55, and her GAF at discharge was 70.[3] (R. at 423.)

---

[3]GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *See Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001). A GAF score of 51 to 60 indicates a "moderate" impairment in social, occupational, or school functioning. *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV-TR) p. 34 (4th ed., rev.2000). A GAF score of 61 to 70 indicates a "mild" impairment in social, occupational, or school functioning. *Id.*

On September 1, 2009, Plaintiff presented to Westlake Medical Center (Westlake) with complaints of ear pain and nausea and was prescribed medication.[4] (R. at 362.) On October 9, 2009, she complained of ear pain and a runny nose, and was again given medication for her symptoms. (R. at 360.) She returned to Westlake due to back and neck pain on October 21, 2009, and she was prescribed Vicodin and Mobic for her symptoms. (R. at 357.)

On November 9, 2009, and November 16, 2009, Plaintiff was assessed with shingles and given a patch and ointment. (R. at 356-57.) She returned to Westlake on December 2, 2009, complaining of dizzy spells. (R. at 354.) She was assessed with anxiety in addition to vertigo and an ear infection. (*Id*.)

On January 11, 2010, Plaintiff presented to Westlake complaining of severe headaches and neck and back pain. (R. at 211.) She was prescribed Hydrocodone and given a refill of Xanax. (*Id*.) She returned due to "crippling anxiety attacks" two to three times a month on March 22, 2010. (R. at 210.) She received a refill of her prescriptions, but refused lab work. (*Id*.)

On April 6, 2010, Plaintiff saw Dr. M.A. Zeb, a cardiologist, who assessed her with atypical angina and a history of smoking, anxiety, and palpitations. (R. at 373-74.) Her EKG showed an incomplete right bundle branch block, and Dr. Zeb planned to do an echocardiogram, carotid study, and nuclear stress test on her. (R. at 374.)

On May 25, 2010, Plaintiff presented to Westlake for back pain and a "stopped up" ear. (R. at 208.) Her paraspinal lumbar muscles were tender to the touch, and she had clear effusion in the ear. (*Id*.) She was assessed with an ear infection and back pain and given medication. (*Id*.)

---

[4]Dr. McKenney and Amanda Clark, P.A., were Plaintiff's treating physicians at Westlake.

On June 8, 2010, Plaintiff was assessed with bronchitis and was prescribed medication.  (R. at 207.) She returned to Westlake for a follow-up examination regarding a urinary tract infection (UTI) she learned she had through her OB/Gyn on June 15, 2010.  (R. at 205.) She complained of dyspareunia, or painful intercourse, and was assessed with trichomoniasis and UTI.  (*Id.*)

On August 16, 2010, Plaintiff was assessed with chronic back pain, dysuria, or painful urination, and anxiety.  (R. at 204.)  She returned to Westlake on September 13, 2010, due to knee pain and a cough.  (R. at 203.)  She was assessed with knee pain, cough, and pharyngitis.  (*Id.*)  On September 27, 2010, she presented with an ear infection and back pain that "comes and goes."  (R. at 202.)  At her request, she was referred to Dr. Chain Banjo for arthritis.  (*Id.*)

Plaintiff saw Dr. Banjo on September 29, 2010, for severe back pain.  (R. at 370.) An "MRI of back" was indicated as the plan of treatment.  (*Id.*)

On October 20, 2010, she had chronic neck, back, and knee pain, and an x-ray was scheduled.  (R. at 199.) On October 29, 2010, she returned for x-rays of her spine and also reported that her heart was racing and skipping the night before.  (R. at 198.) On November 3, 2010, based on her x-rays, she was assessed with degenerative disc disease (DDD) of her cervical spine at C5/6 and 6/7.  (R. at 197.)

Plaintiff complained of an ear infection on December 8, 2010, and although she had serious effusion upon physical exam, her ear was not red.  (R. at 192.)  She was assessed with vertigo.  (*Id.*)  She had throat swelling in addition to ear pain on December 15, 2010.  (R. at 191.)  She returned to Westlake on March 8, 2011, with clear effusion in her ear, which was red.  (R. at 189.)  On March 30, 2011, Plaintiff was assessed with a migraine and chronic neck pain.  (R. at 187.)

On April 6, 2011, Plaintiff presented with a sore throat was assessed with pharyngitis and

Gastroesophageal Reflux Disease (GERD).  (R. at 186.)  It was recommended that she consult a neurosurgeon as a result of her neck pain on May 8, 2011.  (R. at 184.)  She complained of an ear infection on June 13, 2011, and was diagnosed with eustachian tube dysfunction.  (R. at 183.)

On July 15, 2011, Plaintiff reported that she had an episode of a fluttering sensation in her chest that was associated with anxiety.  (R. at 182.)  She was assessed with vertigo, a serious ear infection, and anxiety.  (*Id*.)  It was highly recommended that she take a stress test.  (*Id*.)

On July 27, 2011, Plaintiff was assessed with "DDD C5/6 and C 6/7."  (R. at 180.) On September 7, 2011, she presented with complaints of an ear ache.  (R. at 178.)  She was assessed with sinusitis and an ear infection.  (*Id*.)

On September 26, 2011, Thomas Ripp, M.D., an ear, nose, and throat (ENT) doctor, wrote a letter to Amanda Clark, P.A., regarding Plaintiff's visit to him for her ear problems.  (R. at 368.)  He indicated a clinical impression of minimal low frequency sensorineural loss in Plaintiff's right ear.  (*Id*.)  He noted that she would have a repeat hearing test in six months. (*Id*.)

On October 11, 2011, Plaintiff underwent a psychological evaluation by Dr. J. Lawrence Muirhead, Ph.D.  (R. at 235-237.)  Dr. Muirhead noted that Plaintiff had a history of mental health treatment dating back to age seventeen, when she underwent prescribed treatment for PTSD. (R. at 235.) He noted that she had an abusive family relationship and an abusive relationship with her fifth husband.  (*Id*.)  Plaintiff reported that she had "screaming nightmares" in which she relived some her abusive experiences.  (*Id*.)  She also reported persistent daily anxiety that she was reluctant to treat with medications due to their sedating effect.  (*Id*.)  She said she was too stressed out to apply for a job within the past three years.  (R. at 236.)  Her current stressors included the loss of her home in a fire, the

psychiatric hospitalization of her youngest daughter due to mood disorder, and an older daughter who suffered from a mental health impairment. (R. at 235-36.) Dr. Muirhead noted that she had no history of psychiatric hospitalization or suicide attempts. (R. at 236.) He also noted that she complained of cervical and lumbar back issues for which she was taking Hydrocodone, and she suffered from no other ongoing health difficulties. (*Id.*)

 As for her adaptive behavior, Dr. Muirhead noted that she was independent in her dress and hygiene, routinely performed household chores, could manage her money, had adequate literacy skills, provided care for her pets, and provided care for her two daughters, including one who was disabled as a result of a mental health impairment. (*Id.*) She had no active friendships and was not involved in any group activities. (*Id.*) Regarding her mental health, Dr. Muirhead noted that her attitude was frank and cooperative, but she made exaggerated statements of distress. (R. at 237.) Her mood reflected mild anxiety, her thought processes were relevant, goal-directed and reflected good conceptual development, and she had no difficulty remaining topic oriented. (*Id.*) Intellectually, she appeared to function in an average to low average range. (*Id.*) He found that her judgment appeared to be partially compromised by mild symptoms of anxiety. (*Id.*) He diagnosed her as having PTSD, generalized anxiety disorder, personality disorder, complaints of neck and back ailment, psychosocial stressors, and a GAF of 60. (*Id.*)

On October 17, October 31, and November 15, 2011, Plaintiff presented to Westlake with complaints of an ear infection. (R. at 269-270.)

On October 25, 2011, Dr. Ethan Nguyen, M.D., prepared an orthopedic medical report after a consultative examination. (R. at 240-244.) He noted that Plaintiff reported a history of DDD since 2004, which primarily affected her back and neck secondary to a work injury of her spine. (R. at 240.) She also

6

reported chronic sharp pain and stiffness in her neck and back, migraines from neck stiffness, decreased

range of motion, and weakness exacerbated by physical activity. (*Id.*) She reported that the pain was

usually a "10/10 on most days and 6/10 on [the day of] examination." (*Id.*) Plaintiff was able to lift, carry,

and handle light objects, her hand coordination was good, her rapid alternating movements were intact, and

there were no disturbances of gross and dexterous movements. (R. at 242.) Despite some muscle spasms

in the neck and low back, Dr. Nguyen found no atrophy of any muscles, and Plaintiff was able to perform

both gross and fine manipulations. (*Id.*) Her sensory examination was normal to light touch throughout,

and her straight leg raise was negative bilaterally. (*Id.*) According to Dr. Nguyen, Plaintiff had a steady

gait, did not come with any assistive device, was able to squat and rise with ease, was able to rise from a

sitting position without assistance, had no difficulty getting up and down from the examination table, was

able to walk on her heels and toes with ease, could dress and undress adequately, was cooperative and

gave good effort during examination, had normal tandem walking, and could hop on either foot bilaterally.

(R. at 242.) He found that Plaintiff had full shoulder range of motion, but she had some pain during the

testing. (R. at 243.)

Dr. Nguyen's impression was that Plaintiff had point tenderness at the lower part of her neck,

which was more likely a muscle spasm. (*Id.*) She also had point tenderness in her lower back where she

felt pain when that area was pressed. (*Id.*) She had normal range of motion in her neck but reported mild

pain. (R. at 244.) He found that she could be expected to sit, stand, and walk normally in an eight-hour

workday with normal breaks, she did not need an assistive device with regards to short and long distances

and uneven terrain, she had no limitations with lifting, and she could be expected to lift and carry age and

gender appropriate weight. (*Id.*) Additionally, she had no limitations on bending, stooping, crouching,

7

squatting, etc., and would be able to perform those movements frequently. (*Id.*) Finally, she had no manipulative limitations on reaching, handling, feeling, grasping, fingering and would be able to perform those movements frequently. (*Id.*) His x-ray findings of her cervical spine revealed straightening of the normal lordotic curve, narrowing of the intervertebral disc spaces between "C6 and 7 and 8," and early arthritic change of those vertebrae. (*Id.*)

On November 21, 2011, Dr. Roberta Herman, a state agency medical consultant (SAMC), completed a Case Assessment Form. (R. at 246.) She found that Plaintiff had a medically determinable impairment of early arthritis in her cervical spine, which was non-severe. (*Id.*) Her summary of pertinent medical evidence noted that Plaintiff reported a history of DDD in her back and neck after falling and fracturing her tailbone, and she had chronic sharp pain ever since. (R. at 246.) The summary also noted that no surgery was required for the DDD; Plaintiff had an x-ray that showed interverbral disc space narrowing at C6, 7, 8, which equaled "early arthritic" changes; she had unassisted gait without disturbance; no complaints regarding chest or lungs; no pain or limitations in joints; and no clubbing, cyanosis, or edema. (*Id.*) Finally, the summary noted that there were no significant limitations indicated in the medical evidence of record. (*Id.*)

On November 22, 2011, James B. Murphy, a SAMC, completed a Psychiatric Review Technique (PRT) form. (R. at 247-259.) He found that Plaintiff had medically determinable impairments of PTSD and Generalized Anxiety Disorder (GAD) that were not severe and did not precisely satisfy the requirements for an anxiety-related disorder under the listings in section 12.06 of 20 C.P.R. Part 404, Subpart P, Appendix 1. (R. at 247, 252.) He also found that she had a medically determinable impairment of personality disorder that was also not severe and did not precisely satisfy the requirements for a

8

personality disorder under section 12.08 of the listings. (R. at 247, 256.) Dr. Murphy noted that Plaintiff had no restriction in activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. at 257.) The consultant's notes associated with the PRT reflected that Plaintiff had been given a GAF of 60, she had an abusive relationship with her fifth husband, she made claims of daily anxiety, and she had recently lost a home to a fire. (R. at 259.) The notes also reflected that she had no history of psychiatric hospitalization or suicide attempt, she completed daily activities around the house and cared for two daughters, she was competent to manage funds, she had adequate literacy skills, she owned and operated a car, and she accessed a computer. (*Id.*) Additionally, the notes reflected that her speech was normal, her mood reflected mild anxiety, she had good thought processes, average intelligence, and clear sensorium. (*Id.*) Dr. Murphy ultimately found that she had no significant limitations and her alleged disabling limitations were not wholly supported by the evidence of record. (*Id.*)

On November 29 and 30, 2011, Plaintiff returned to Westlake for treatment of a UTI. (R. at 265-66.) She was assessed with chronic back pain on November 30, 2011. (R. at 265.)

On December 22, 2011, Dr. Sarah Jackson completed a Case Assessment Form for reconsideration of the November 22, 2011 PRT. (R. at 274.) Based upon all the evidence in the record, she reaffirmed the finding in the PRT that Plaintiff's PTSD, GAD, and personality disorder were not severe. (*Id.*) On January 1, 2012, Dr. Laurence Ligon completed a Case Assessment Form for reconsideration of the November 21, 2011 assessment. (R. at 275.) Based upon all the evidence in the record, he reaffirmed the assessment. (*Id.*)

On December 22, 2011, Plaintiff returned to Westlake after suffering from the flu. (R. at 451.)

9

She was assessed with indigestion although it was noted that previous epigastric pain had resolved.  (*Id*.)

She returned on January 3, 2012, due to fluid in her ear and tingling in her temple and jaw.  (R. at 449.)

 She was referred to an ENT.  (*Id*.)  On January 16, 2012, she presented with neck pain and pain in her

left rib.  (R. at 448.)  She was given an anti-inflammatory.  (*Id*.)  She was assessed with left neck

tenderness, GAD, and panic disorder on February 1, 2012.  (R. at 447.)  She had an earache on February

6, 2012.  (R. at 446.)

She returned to Westlake on March 7, 2012, with complaints of ear pain.  (R. at 444.)  She was

assessed with ear pan, an ear infection, and anxiety.  (*Id*.)  On April 2, 2012, she complained of back pain

that started the previous day and thought the pain may have been due to her kidneys.  (R. at 443.)  She was

assessed with a possible UTI.  (*Id*.)  She returned April 17, 2012 and was assessed with bereavement and

anxiety due to a death in the family.  (R. at 442.)

Plaintiff was not able to keep her balance and felt like she was walking sideways on May 1, 2012.

(R. at 441.)  It was recommended that she consider an ENT evaluation.  (*Id*.)  On May 10, 2012, she

complained of pain in her left shoulder and was assessed with muscle skeletal pain.  (R. at 440.)  On May

30, 2012, Plaintiff had an earache and a hard time catching her breath.  (R. at 430.)  She was assessed with

epigastric pain.  (*Id*.)  She continued to have ear pain on June 20, 2012, and she had been sneezing and

was itchy due to a new cat.  (R. at 436.)

On July 11, 2012, Plaintiff presented to Westlake with complaints of ear pain, and she was

assessed with an ear infection as well as neck and back pain.  (R. at 433-434.)  She was positive for

headaches and neck pain on August 20, 2012.  (R. at 432.)  On September 10, 2012, she suffered from

constipation.  (R. at 431.)  On September 19, 2012, she presented with complaints of neck pain and

10

anxiety, and she was assessed with chronic neck pain and panic attacks.  (R. at 430.)

On August 23, 2012, Linda LeClair-Stapleton, a licensed clinical social worker, wrote a letter regarding psychotherapeutic services she had provided to Plaintiff since October 31, 2011.  (R. at 426.) She had completed ten sessions that focused on the loss of Plaintiff's home in December 2010 due to a fire, her childhood abuse, abuse from a former marriage, and management of her symptoms.  (*Id*.)  Her diagnoses were anxiety, not otherwise specified; PTSD; and personality disorder, not otherwise specified. (*Id*.)  She assigned a GAF of 55.  (*Id*.)  She concluded that Plaintiff did not appear employable at that time, but she was able to manage her funds.  (*Id*.)

### 3.      Hearing Testimony

On December 6, 2012, Plaintiff, a medical expert (ME), and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 33-63.)  Plaintiff was represented by an attorney.  (R. at 35.)

#### a.      *Plaintiff's Testimony*

Plaintiff testified that she was 47 years old, 5 feet 6 inches tall, weighed about 106 pounds, and was left-handed.  (R. at 36.)  She had an eleventh grade education and no vocational or specialized training. (R. at 37-38, 59.)  She also had no military training or service.  (R. at 38.)

She had been divorced five times.  (R. at 37.)  She had six children, including one that was under the age of eighteen and living with her at the time of the hearing.  (R. a 37.)  Although she had alleged that she became disabled and unable to work on April 15, 2008, the ALJ proposed, and her attorney agreed to change her onset date to July 11, 2011, the date she applied for SSI benefits.  (R. at 37.)  She had not done any work for pay since July 11, 2011.  (*Id*.)

Plaintiff claimed she was disabled because she suffered from PTSD and had DDD of her neck and

her back. (*Id*.) She received medication and therapy for her PTSD. (*Id*.) Her attorney indicated at the

hearing that he could not obtain several medical records regarding the PTSD because they involved abuse

by a former spouse. (*Id*.) Plaintiff had to change her name and her social security number, and retrieving

the records would "basically blow her cover." (R. at 39-40.)

Plaintiff testified that the PTSD stemmed from beatings and rape by an ex-husband for fifteen years

during the course of the marriage and after. (R. at 40.) The authorities could not find him, although she

filed criminal charges against him, and a "state-to-state" warrant was issued for his arrest. (*Id*.) He had

evaded arrest for fifteen years, and he was still trying to find her. (R. at 41.) She had no contact with him.

(*Id*.)

She has suffered from PTSD she was seventeen years old due to rape by her father and abuse from

her mother. (*Id*.) The PTSD was manifested by flashbacks, losing track of where she was, night terrors,

pain where her bones were broken, and anxiety attacks she experienced everyday. (*Id*. at 42.)

About three years prior, she started having really bad pains in her neck and back, secondary to

the beatings fifteen years prior. (R. at 42-43.) She also had arthritis in her neck and back. (R. at 43.)

When she would try to lift something, it would cause so much pain that she ended up having migraines and

"laying in bed and vomiting." (*Id*.) She could not even roll herself out of bed. (*Id*.)

She could sit in a chair for about twenty to thirty minutes before she had to stand up. (*Id*.) She

could stand about twenty to thirty minutes before she had to sit down. (R. at 44.) She could probably

walk about one 300 foot block before she needed to stop and rest. (*Id*.) She could lift maybe two or

three pounds from the table using both hands to lift it up and set it down, after taking her medication. (*Id*.)

12

She took Hydrocodone for the pain and Xanax for the anxiety attacks.  (R. at 45.)  They made her feel "flighty" to the point where she would "stagger like [she was] drunk."  (*Id*.)  Although she did not like how she felt on the medication and she could not function on it, it was the only thing that made the pain go away.  (*Id*.)  She saw her treating doctor, Carl McKenney, for her neck and back.  (*Id*.)  He and his physician assistant, Amanda Clark, also treated her for her PTSD.  (R. at 46.)

Upon examination from her counsel, Plaintiff testified that she could still drive short distances, such as five miles, in order to go to the doctor's office about once a month.  (R. at 47.)  Her son drove her to the hearing that day.  (*Id*.)  Also, her migraines came if she did "anything," such as sweeping the floor and moving her arms and shoulders.  (*Id*.)  When she got a migraine, she would just take Hydrocodone or go to bed and sleep.  (*Id*.)  As for her daily activities with her "condition," she would get up, fix a cup of coffee, and then walk outside and sit and play with her dogs.  (*Id*.)  She did some laundry, but she needed help from her kids.  (R. at 48.)  She went grocery shopping with her kids, but she sat in a cart while they picked up the groceries.  (*Id*.)  Her children did the cooking.  (*Id*.)  She had been going to counseling with Ms. LeClaire-Stapleton for about a year to discuss controlling her night terrors and flashbacks.  (*Id*.)  Being around people caused an anxiety attack.  (R. at 48-49.)  There were days when she would get scared that her abusive ex-husband was "out there" watching her, and she would lock herself in her home and refuse to come out.  (R. at 49.)  About once a day, she would look out the window to see if there were people lurking around outside.  (*Id.*)

### b.    *ME's Testimony*

The ME began his testimony by noting that the consultative exam in the record regarding Plaintiff's physical complaints was "essentially" in normal limits.  (R. at 50.)  Other than muscle spasms in her back,

as well as some tenderness, it was normal. (*Id.*) He also noted that she had an x-ray of her cervical spine that demonstrated early degenerative changes that could be consistent with the aging process. (*Id.*) He testified that the notes regarding the exam did not describe the degenerative changes well enough to be certain, but the changes were similar to what was described in most people. (R. at 50-51.)

The ME declined to adopt the findings of the consultative exam because he disagreed with some of the limitations. (*Id*) According to him, Plaintiff had migraine headaches which may or may not have been triggered by cervical degenerative changes. (*Id.*) Absent an MRI scan, what he saw on the "plain x-rays" could certainly be producing some pain. (*Id.*)

When asked if Plaintiff's migraines were fully developed by the record, he testified that the notes of her treating physician, Dr. McKenney, reflected treatment for headaches and neck pain. (R. at 53.) Dr. McKenney did not describe the type of headaches, but he discussed the symptoms. (R. at 53-54.) He stated that the consultative exam also mentioned it, but did not describe any of the specifics. (*Id.*) The ALJ pointed out that during the consultative exam, Plaintiff reported feeling some tension and pressure at the lower neck, but no pain, and she was found to have normal range of motion in her neck. (*Id.*)

The ME testified that he would place Plaintiff at the light level for lifting due to the degenerative changes with the associated pain, the objective finding of muscle spasms and tenderness in the paraspinal region, and her complaints of chronic neck and back pain. (R. at 55.) He found that pain would be aggravated by doing "medium type of lifting." (R. at 54-55.) Specifically, he found she could lift only ten pounds frequently, and twenty pounds occasionally. (R. at 55.) He also suggested that pushing, pulling and overhead lifting be reduced to the occasional level for those same reasons. (*Id.*) He saw no limitations for standing, walking or sitting. (R. at 55.)

14

As far as the mental issue, the ALJ stated that since there was no psychiatrist or psychologist at the hearing, he had to rely on the findings of the consultative examiner, Dr. Muirhead. (R. at 56.) He read some of her findings into the record. (R. at 56-57.) The ALJ found that Plaintiff's statements in the consultative exam were directly contrary to her statements at the hearing that she had no contact with her husband in the past fifteen years. (R. at 57.) He stated that he thought she engaged in extended exaggerations and was therefore " hard pressed to accept the evaluation." (*Id*.) He noted that the evaluation assessed PTSD, general anxiety, and personality disorder. (*Id*.) He stated that the personality disorder diagnosis there was a catchall for when the clinician could not determine the exact problem. (R. at 57-58.) He further noted that Dr. Muirhead gave Plaintiff a GAF of 60 for moderate symptoms, but at the same time he pointed out that she exaggerated. (R. at 58.) Additionally, the ALJ found that Plaintiff's testimony was contrary to part of Dr. Muirhead's finding in her report. (*Id*.) He noted that the report did not mention rape after her divorce or separation, the rape by her father, and any extended non-verbal separation for fifteen years. (*Id*.) It mentioned Plaintiff being constantly harassed via her email by her ex-husband. (*Id*.) According to the ALJ, the harassment by email can be "relatively simply dealt with by referring communications from that person directly to trash." (*Id*.) He found that "all considered," there was not a sufficient basis for finding a mental impairment. (*Id*.) He further found that her mental condition was non-severe within the meaning of "*Stone v. Heckler*." (*Id*.)

    *c.*       *VE's Testimony*

The ALJ pointed out that although the ME found limitations for push, pull, overhead reaching, and lifting, he had to accept the report of the examining doctor. (*Id*.) Because the examining doctor indicated that there were no limitations, he gave her no limitations. (*Id*.) As Plaintiff had no past relevant work, the

ALJ first asked the VE if he saw more than an abundant number of jobs that she could perform. (*Id.*) The VE testified that there were an abundant number of jobs, and with her unlimited Residual Functional Capacity (RFC), they would look at unskilled work at the sedentary, light, and medium levels. (R. at 59-60.) He noted that her eleventh grade education should allow performance of simple repetitive one or two step tasks. (R. at 60.)

An example of a job she could perform at the medium, unskilled level was a hand packager (DOT 920.587-018, SVP-2), which had 3,000 jobs in the greater Dallas region, 12,000 jobs in Texas, and 120,000 jobs nationally. (*Id.*) An example at the light, unskilled level would be a housekeeper (DOT 323.687-014, SVP-2), which had approximately 20,000 jobs in the greater Dallas region, 80,000 jobs in Texas, and 800,000 jobs nationally. (*Id.*) An example at the sedentary, unskilled level would be an eyeglass frame packager (DOT 713.684-038, SVP-2), which is a two step packaging job. (*Id.*) It had approximately 200 jobs in the greater Dallas region, 800 jobs in Texas, and 8,000 jobs nationally. (*Id.*)

## C.   **The ALJ's Findings**

The ALJ issued his decision denying benefits on December 21, 2012. (R. at 17.) At step one,[5] he found that Plaintiff had not engaged in substantial gainful activity since July 11, 2011, the date she applied for benefits, and she never worked at a substantial gainful activity level. (R. at 19.) At step two, he found that Plaintiff had two severe impairments: degenerative disc disease of the cervical spine and neck pain. (R. at 19.) Despite those impairments, at step three, he found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social

---

[5]The references to steps one to four refer to the five-step analysis used to determine whether a claimant is disabled under the Social Security Act, which is described more specifically below.

security regulations. (R. at 23.) Next, the ALJ determined that Plaintiff had the RFC to perform a full

range of work at all exertional levels as defined by the social security regulations. (R. at 23.) He also

found that she had no physical or mental limitations. (*Id.*) At step four, he found that Plaintiff had no past

relevant work. (R. at 28.) At step five, based on the VE's testimony, the ALJ determined that Plaintiff

could perform unskilled jobs existing in significant numbers in the national economy, such as hand packager,

housekeeper, and eyeglass frame packager, which were at the medium, light, and sedentary levels,

respectively. (R. at 29.) Accordingly, the ALJ determined that Plaintiff had not been under a disability,

as defined by the Social Security Act, from her onset date through the date of the ALJ's decision. (*Id.*)

## II.   ANALYSIS

### A.   <u>Legal Standards</u>

#### 1.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's

position is supported by substantial evidence and whether the Commissioner applied proper legal standards

in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §

405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as

adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."

*Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295

(5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the

evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine

whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence

is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical

findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.* at 436 and n.1.

### 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found

18

disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)

(currently 20 C.F.R. § 404.1520(a)(4)(I)-(v) (2012)). Under the first four steps of the analysis, the burden

lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the

Commissioner determines at any point during the first four steps that the claimant is disabled or is not

disabled. *Id*.  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to

the Commissioner at step five to show that there is other gainful employment available in the national

economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236.  This burden may be

satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational

testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  After the

Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the

alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  "A finding that a claimant is

disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."

*Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

B.    **Issues for Review**

Plaintiff presents three issues for review:

1. Whether the ALJ erred by finding Plaintiff's Posttraumatic Stress Disorder and Generalized Anxiety Disorder are Nonsevere Impairments;

2. Whether the ALJ Erred by Failing to Reconcile His Step Two and RFC Findings; and

3. Whether the ALJ Erred by Giving Great Weight to the Opinion of the Consultative Examiner and Little Weight to the Medical Expert.

(doc. 23 at 1.)

C.    **Incorrect Severity Standard[6]**

As part of her first issue, Plaintiff argues that the case must be remanded because the ALJ's decision incorrectly states the standard set forth in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985). (doc. 23 at 5.) She claims that his failure to use the proper standard "improperly allow[ed] for Plaintiff's mental impairments to impose minimal limitations on her ability to perform basic work-related activities." (*Id.*)

1.    *Stone Error*

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c) (2012). Finding that a literal application of these regulations would be inconsistent with the Social Security Act, the Fifth Circuit has held that an impairment is not severe "only

---

[6]Plaintiff did not list this argument regarding the incorrect severity standard as one of her issues for review, but because she separately briefed this argument, it will be addressed. It is discussed first because the definition of "severity" used by the ALJ at step two impacts the disability analysis in the remaining steps. *See Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000).

if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104–05 (5th Cir. 1985). "Because a determination [of] whether an impairment[] is severe requires an assessment of the functionally limiting effects of an impairment[], [all] symptom-related limitations and restrictions must be considered at this step." Social Security Ruling (SSR) 96-3P, 1996 WL 374181, at *2 (S.S.A. July 2, 1996). "*Stone* provides no allowance for a minimal interference on a claimant's ability to work." *Scroggins v. Astrue*, 598 F.Supp.2d 800, 805 (N.D.Tex. 2009). Ultimately, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity." *Stone*, 752 F.2d at 1104.

To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) [(2012)] is used." *Id*. at 1106; *see also Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). Notwithstanding this presumption, however, courts must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986).

Here, in reciting the applicable law, the ALJ stated:

A medically determinable impairment is 'severe' if it is more than a slight abnormality and imposes more than a minimal limitation on physical or mental ability to engage in basic work activities (20 CFR § 404.1520(c)[;] §404.1521; SSR 85-28, and *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985)).
...

21

> An impairment is non-severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience. *See Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985).
>
> ...
>
> The claimant's mental condition is nonsevere within *Stone v. Heckler.* Her credibility is suspect. Consequently, the undersigned finds that the claimant's posttraumatic stress disorder and generalized anxiety disorder have no more than a minimal effect on an individual's ability to perform basic work related activities. The claimant's medically determinable mental impairments of posttraumatic stress disorder and generalized anxiety disorder considered singly, and in combination, *do not cause more than minimal limitation* in the claimant's ability to perform basic mental work activities, and are therefore nonsevere.

(R. at 19-20.)(emphasis added).

As noted, *Stone* provides no allowance for a *minimal* interference with a claimant's ability to work. The ALJ recited both the proper standard and an improper standard that allows for a finding of nonseverity even where the impairments have "no more than a minimal effect" on Plaintiff's ability to work. *See Neal v. Comm'r of Soc. Sec. Admin,* No. 3:09-CV-0522-N, 2009 WL 3856662, at *1 (N.D.Tex. Nov. 16, 2009)("Even though citation to *Stone* may be an indication that the ALJ applied the correct standard of severity, nowhere does *Stone* state that the ALJ's citation to *Stone*, without more, conclusively demonstrates that he applied the correct standard."). The ALJ failed to specify which standard he applied. His statement regarding a "minimal limitation" suggests he found that Plaintiff's mental impairments did not cause *more than a minimal limitation* on her ability to perform basic mental work activities. It therefore appears that he applied the incorrect standard of severity. *See Garcia v. Astrue*, No. 3:08-cv-1881-BD, 2010 WL 304241, at *3 (N.D. Tex. Jan. 26, 2010) (noting that courts in this district have consistently rejected, as inconsistent with *Stone*, the same language that the ALJ used in this case).

22

2.    **The "Technique"**

Notwithstanding his application of an incorrect severity standard, the ALJ then applied what has

been referred to as the "technique." (R. at 20.) It requires an ALJ to rate the degree of functional limitation

regarding each medically determinable mental impairment he finds. 20 C.F.R. § 404.1520a(a). The

degree of functional limitation is rated in four broad functional areas: activities of daily living; social

functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §

404.1520a(c)(3). If he rates the degree of limitation in the first three functional areas as "none" or "mild"

and as "none" in the fourth area, the impairment will be found not severe, unless there is evidence that

indicates that there is more than a minimal limitation in the ability to do basic work activities. 20 C.F.R. §

404.1520a(d)(1).

Courts have found that an ALJ has used the appropriate severity standard when he or she has

utilized the technique in certain circumstances. *See Andrews v. Astrue*, 917 F.Supp.2d 624, 634-36

(N.D.Tex. 2013) (reviewing the ALJ's use of the technique set forth in the regulations for evaluation mental

impairments); *Andrade v. Astrue*, No. 4:11-cv-318-Y, 2012 WL 1106864, at *8 (N.D.Tex. Feb 13,

2012)(same); *Martinez v. Astrue*, No. 4:10-cv-883-Y, 2011 WL 3930219, at *7 (N.D. Tex. Aug. 18,

2011)(same), *rec. adopted*, 2011 WL 3930216 (N.D.Tex. Sept. 7, 2011). Although the technique does

not contain the severity standard set forth in *Stone*, an ALJ's finding of no limitations or even mild limitations

pursuant to the technique would not be inconsistent or contrary to *Stone*. *See Stone*, 752 F.2d at 1101,

1104-05 (holding that an impairment is not severe "only if it is a slight abnormality having such minimal

effect on the individual that it would not be expected to interfere with the individual's ability to work");

*White v. Astrue*, No. 4:08-cv-415-Y, 2009 WL 763064, at *11 (N.D. Tex. Mar. 23, 2009)(holding the

23

ALJ's finding of nonseverity was not contrary to *Stone*, despite the ALJ's recitation of an improper

standard of severity, where the ALJ applied the special technique set forth in the regulations for evaluating

mental impairments and found mild deficits in her concentration, persistence or pace, as well as social

functioning").

    In this case, the ALJ stated:

> [T]he undersigned has considered the four broad functional areas set out in the disability
> regulations for evaluating mental disorders and in section 12.00C of the Listing of
> Impairments (20 CFR, Part 404, Subpart P, Appendix 1).  ...

> Regarding functional area limitations, the claimant has no limitation in activities of daily
> living, social functioning, concentration, persistence or pace.  The fourth functional area is
> episodes of decompensation.  In this area, the claimant has experienced no episodes of
> decompensation, which have been of extended duration.

> Because the claimant's medically determinable mental impairments cause no limitation in
> any of the first three functional areas and "no" episodes of decompensation which have
> been of extended duration in the fourth area, they are nonsevere (20 CFR
> 416.920a(d)(1)).

(R. at 20.)  His application of the technique in making his severity determination as to Plaintiff's mental

impairments, is sufficient to avoid reversal under *Stone*.  *See Andrews*, 917 F.Supp.2d 624, 635-36

(finding the ALJ's analysis of the claimant's mental impairments under the technique was sufficient to avoid

reversal pursuant to *Stone* and its progeny); *Andrade*, 2012 WL 1106864, at *8-9 (finding that although

the ALJ cited conflicting severity standards, his determination pursuant to the technique that the claimant

had no severe mental impairments was an implicit finding that her mental impairments had such minimal

effect that they would not be expected to interfere with the claimant's ability to work, and was therefore

sufficient to avoid reversal under *Stone*); *Martinez*, 2011 WL 3930219, at *7 ("[T]he Court concludes

... that the ALJ's analysis of [the claimant's] depression under the technique, resulting in a finding that [the

claimant] had only a mild impairment in the four functional areas, is sufficient to avoid reversal pursuant to *Stone* and its progeny.")[7].  Accordingly, remand is not required on this issue because the ALJ's utilization of the technique supports the conclusion that he ultimately applied the correct severity standard in evaluating Plaintiff's mental  impairments.[8]

## D.      Severity

In her first issue, Plaintiff argues that even if the ALJ used the proper severity standard, substantial evidence of record does not support the finding that her PTSD and GAD are not severe.  (doc. 23 at 5.)  She contends that in providing substantial weight to Dr. Muirhead's opinion, the ALJ failed to addressed Plaintiff's GAD and personality disorder, not other specified, and he failed to weigh the importance of the GAF score of 60, which indicated moderate symptoms and moderate difficulties in social and occupational functioning.  (*Id*. at 8-9.)  Finally, Plaintiff contends that the ALJ improperly relied upon decisions from nonexamining SAMCs, who opined that Plaintiff did not suffer from a severe mental disorder, even though the SAMCs did not have an opportunity to review the entire record.  (*Id*. at 9.)

In making his disability determination, an ALJ is required to determine whether a claimant has "impairments" which, singly or in combination, are severe. 42 U.S.C. § 1382c. "For Social Security disability purposes, an 'impairment' is an abnormality that can be shown by medically acceptable clinical

---

[7]*cf. Vinning v. Astrue*, No. 4:08-cv-059-A, 2009 WL 920192, at *4 (N.D.Tex. Apr. 2, 2009)(stating that a "finding of *more* than mild impairment in [the claimant's] mental functioning would suggest that a severe mental impairment existed")(emphasis added).

[8]Notably, the technique outlined in the regulations contains language that conflicts with *Stone's* severity standard, namely, "[i]f we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise  indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1).  As such, an ALJ's reference to the technique may not, in every case, be sufficient to avoid reversal under *Stone*.  *See, e.g.*, *Vinning*, 2009 WL 920192, at *4.

and laboratory diagnostic techniques, and in fact must be established by medical evidence as opposed to the claimant's subjective statement or symptoms. *Prince v. Barnhart*, 418 F. Supp. 2d 863, 867 (E.D. Tex. 2005) (citing 20 C.F.R. § 416.908). When determining whether a claimant's impairments are severe, an ALJ is required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, would be of sufficient severity. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. § 404.1523). If the ALJ does find a medically severe combination of impairments, "the combined impact of the impairments will be considered throughout the disability determination process." 20 C.F.R. § 404.1523.

Here, substantial evidence in the record supports the ALJ's findings that Plaintiff's PTSD and GAD were not severe. Dr. Muirhead noted that Plaintiff routinely performed household chores, was able to manage her money, had adequate literacy skills, provided care for her pets and children, including a daughter who was disabled. (*See* R. at 236.) He found that her mood reflected mild anxiety, she had no difficulty remaining topic oriented during the interview, and her thought-processes were relevant and reflected good conceptual development. (*See* R. at 237.) He also noted that she had no history of psychiatric hospitalization or suicide attempts. (*Id.*) Despite her history of abuse and current issues with the loss of her home and the mental impairment of her daughter, Dr. Muirhead found that she made exaggerated statements of distress. (*See* R. at 237.) He diagnosed Plaintiff with PTSD, GAD, personality disorder, and psychosocial stressors with a moderate GAF score of 60. (R. at 236.) Also, Dr. Murphy, a SAMC, found that Plaintiff's PTSD, GAD, and personality disorder were nonsevere, she had no significant limitations, and her disabling limitations were not wholly supported by the evidence of record.

(R. at 247, 259.) Dr. Murphy's assessment was reaffirmed by Dr. Jackson on December 22, 2011. (R.

at 274.)

Plaintiff's argument that the ALJ failed to address Dr. Muirhead's assessments of GAD and

personality disorder is unsupported. The ALJ's recitation of the record noted that Dr. Muirhead found that

she suffered from mild anxiety. (*See* R. at 21.) Also, he noted that the PPT form by Dr. Murphy reflected

that her PTSD, GAD, and personality disorders were nonsevere. (R. at 22.) He further noted Dr.

Murphy's opinion that Plaintiff had no significant mental functional limitations, which was affirmed as written

a month later. (*Id*.)

Regarding Plaintiff's argument as to the importance of Dr. Muirhead's finding that Plaintiff had a

GAF score of 60, courts have declined to find a correlation between a claimant's GAF score and his or

her ability or nonability to do work. *See Murdock v. Astrue*, No. 4:09-cv-327-Y, 2010 WL 3448084,

at *8 (N.D. Tex. Aug. 3, 2010) (citing cases), *rec. adopted*, 2010 WL 3448080 (N.D. Tex. Sept. 1,

2010). Additionally, at the hearing, the ALJ noted that Dr. Muirhead gave Plaintiff a GAF score of 60,

which reflects moderate symptoms. (*See* R. at 58.) The ALJ pointed out that Dr. Muirhead also found

that Plaintiff made exaggerated statements and that some of her statements at the hearing conflicted with

those she made to Dr. Muirhead. (*Id*.) Dr. Muirhead's specific observations regarding Plaintiff's mental

health supported the ALJ's finding that her mental impairments were not severe. *See Murdock*, 2010 WL

3448084, at *8-9 (finding substantial evidence to support ALJ's decision that Plaintiff did not have a severe

impairment despite a GAF score of 55).

Plaintiff's argument that the ALJ improperly relied upon the opinions of the SAMCs who did not

have the ability to review the entire record is also unavailing.  The SAMCs had sufficient evidence before them from the record to make a determination regarding the severity of Plaintiff's impairments.  Dr. Murphy's notes showed that he thoroughly reviewed the record before him before making his assessment. (*See* R. at 259.)  Additionally, the records made after the SAMCs' assessment do not specify any limitations caused by Plaintiff's mental conditions that would cause the SAMCs' assessment to differ.  After Dr. Jackson's reaffirmation of Dr. Murphy's assessment, the record shows that Plaintiff complained of and was assessed with anxiety, panic disorder, and panic attacks at Westlake on only three more occasions; these were complaints and assessments similar to those made at Westlake prior to the SAMCs' assessments.  (*See* R. at 430, 442, 444, 446.)  There was also no indication of any limitations as a result of the anxiety or panic.  (*See id*.)  Dr. LeClair-Stapleton's assessments regarding Plaintiff also post-dated the SAMCs' assessments.  However, Dr. LeClair-Stapleton gave no opinion as to any limitations caused by Plaintiff's mental impairments except for an unsupported GAF assessment.  Accordingly, the SAMCs' assessments would not have been any different if they had these records.

To the extent the record reflects any conflicting evidence that Plaintiff's mental impairments are severe, the record as a whole provides substantial evidence in support of the ALJ's finding that her mental impairments are not severe.  *See Zimmerman v. Astrue*, 288 F. App'x 931, 937 (5th Cir. 2008)(noting that the record contained some conflicting evidence, but finding that the ALJ's conclusion about the claimant's mental impairment was supported by substantial evidence); *Menchaca v. Barnhart*, 179 F. App'x 215, 216 (5th Cir. 2006)("[I]f the Commissioner's conclusion is supported by substantial evidence, we must affirm it, even in the face of conflicting evidence.").  The ALJ's decision that Plaintiff's mental

impairments are not severe is supported by substantial evidence.

## E.   Reconciliation of Step Two and RFC Findings

Plaintiff next argues that the ALJ erred by failing to reconcile his step two and RFC findings in violation of "the regulations and SSR 96-8p." (doc. 23 at 9.)  She contends that the ALJ failed to incorporate any functional limitations from her severe limitations of DDD of the cervical spine and neck pain in his RFC finding.  (*Id*. at 10.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1) (2003). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir.

1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  Courts "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* They may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence". *See Johnson*, 864 F.2d at 343 (citations omitted).

As noted, at step two, the ALJ found that Plaintiff had severe impairments of DDD of the cervical spine and neck pain based on the objective findings and subjective allegations. (*See* R. at 19.)  He stated that these impairments "cause significant limitation in the claimant's ability to perform basic work activities." (R. at 22.)  After finding that she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the regulations, the ALJ found that Plaintiff had no physical or mental limitations and had the RFC to perform a full range of work at all exertional levels.  (R. at 23.)

As stated in *Spears v. Barnhart*, "the purpose of assessing the claimant's RFC is to determine the work that can be done despite present limitations[; however] the ALJ ... did not include any limitations–basically contradicting the fact that he found her impairments to be severe." 284 F.Supp.2d 477, 483 (S.D.Tex. 2002); *see also Norman v. Astrue*, No. SA-10-CA-849-XR, 2011 WL 2884894,

at *6 (W.D. Tex. July 18, 2011)("Similar to *Spears*, here the ALJ did not include any limitations resulting from the [impairment], contradicting his own finding that the [impairment] was 'severe'"). Texas federal courts have held that such an inconsistency warrants remand. *See Spears*, 284 F.Supp.2d at 483 (finding the ALJ's failure to address the claimant's limitations related to her severe impairment was remandable error); *Norman*, 2011 WL 2884894, at *6 (finding remand was warranted where the ALJ found the claimant's limitation was severe at Step 2, but failed to include any limitation resulting from the impairment in his RFC analysis); *Martinez v. Astrue*, No. 2:10-cv-0102, 2011 WL 4128837, at *5-7 (N.D.Tex. Sept. 15, 2011), *rec. adopted*, 2011 WL 4336701 (N.D.Tex. Sept. 15, 2011). In *Martinez*, for instance, the ALJ failed to include limitations from the plaintiff's hand surgery in the RFC despite finding that the hand surgery was a severe impairment. 2011 WL 4128837, at *5-6. The court remanded the case because it was unable to determine whether the ALJ intended the hand surgery to be a severe impairment, and if so, whether the RFC should have included certain limitations relating to it. *Id*. at *7. The court explained that if the RFC should have included those limitations, then the ALJ was required to seek additional testimony from the VE as to whether the plaintiff could still perform the jobs identified by the VE. *Id*.

Conversely, several Texas federal courts have found that an ALJ does not err solely by finding an impairment severe at step two and failing to attribute any limitation to that impairment in his RFC assessment. *See Kozlowski v. Colvin*, No. 4:13-cv-020-A, 2014 WL 948653, at *5-6 (N.D.Tex. Mar. 11, 2014); *Gonzalez v. Colvin*, No. 4:12-cv-641-A, 2014 WL 61171, at *6 (N.D.Tex. Jan. 6, 2014); *Scott v. Colvin*, No. 4:12-cv-01569, 2013 WL 6047555, at *11 (S.D.Tex. Nov. 14, 2013); *Carnley v. Colvin*, No. 3:12-cv-3535-N, 2013 WL 5300674, at *9 (N.D.Tex. Sept. 20, 2013); *Adams v.*

*Colvin*, No. 4:12-cv-490-A, 2013 WL 5193095, at *9 n. 6 (N.D.Tex. Sept. 13, 2013).  In fact, the

Middle District of Florida has found that this is the "prevailing rule," citing cases in several circuits that made

such a finding.  *See Davis v. Comm'r of Soc. Sec.*, No. 6:12-cv-16940-orl-36TBS, 2013 WL 6182235,

at *6 (M.D. Fl. Nov. 25, 2013)(citing cases).  In those cases, the courts held that a finding that an

impairment is severe does not necessarily lead to a conclusion that the impairments imposed significant

work-related limitations for purposes of an RFC.  *See id.*

Here, the ALJ expressly found that Plaintiff's DDD of the cervical spine and neck pain caused

"significant limitation in the claimant's ability to perform basic work activities" but then found that she had

no physical limitations at all.  (R. at 22-23.)  As in *Martinez*, it is unclear if the ALJ intended to include

Plaintiff's DDD of the cervical spine and neck pain as severe impairments.

This case is also distinguishable from some of the Texas federal cases finding no error because in

those cases, the ALJ considered limitations that encompassed those imposed by the severe impairments

or that accounted for the limitations in some respect before making a disability finding.  *See, e.g., Gonzalez*,

2014 WL 61171, at *6 (finding the ALJ's decision was not subject to reversal where, although the ALJ

did not set forth specific limitations in his RFC determination relating to only the claimant's severe

impairment, he found other limitations that took into account the claimant's severe impairment); *Carnley*,

2013 WL 5300674, at *9 (finding although the ALJ erred by finding claimant's seizure disorder to be a

severe impairment and failing to incorporate limitations from the disorder into the RFC, it was clear he

intended to include seizure limitations because the hypothetical questions posed to the VE at the hearing

included such limitations; therefore there was no need to remand the case).  Here, the ALJ failed to note

any limitations at all with respect to the severe impairments at any point in making his disability determination, despite expressly finding that there were limitations.  Given the inconsistency in the ALJ's finding of severity at Step 2 regarding Plaintiff's physical impairments and his assertion that there were signification limitations attributed to those impairments, with his failure to include any limitations regarding those impairments in his RFC analysis, remand is required on this issue.[9]

### III.   CONCLUSION

The Commissioner's decision is **AFFIRMED in part and REVERSED in part**, and the case is **REMANDED** to the Commissioner for further proceedings in order to determine whether Plaintiff's degenerative disc disease of the cervical spine and neck pain are, in fact, significant impairments, and if so, whether they impose any limitations on Plaintiff's RFC.

**SO ORDERED on this 30th day of September, 2015.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[9]Because the ALJ's proper determination of Plaintiff's RFC on remand will likely affect Plaintiff's remaining issue, it is not addressed.